Argued and submitted June 24, 2009, reversed and remanded June 23, 2010

## Susan ARONSON,
*Petitioner,*

*v.*

## PUBLIC EMPLOYEES RETIREMENT BOARD,
*Respondent.*

Public Employees Retirement Board
061026; A137578

236 P3d 731

Michael C. Petersen argued the cause for petitioner. With him on the briefs was Heltzel, Williams, Yandell, Roth, Smith & Petersen, P.C.

Cecil A. Reniche-Smith, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Petitioner seeks judicial review of a final order of the Public Employees Retirement Board (board), in which the board concluded that petitioner's membership in the Public Employees Retirement System (PERS) had lapsed in 1981 and recalculated the service time, contributions, and associated earnings that had been credited to her member account between 1975 and 1976, and 1978 through 1991. The board reached that conclusion based on its determination that petitioner was "absent from the service" of all participating PERS employers within the meaning of *former* ORS 237.109(2) when she was working less than 600 hours a year, each year between 1978 and 1987.[1] As a result of that recalculation, petitioner's projected retirement benefit dropped from a range of $1,006 to $1,214 per month, to approximately $665 per month. For the reasons set forth below, we reverse and remand.

The material facts are uncontested. On January 6, 1975, petitioner started working for the University of Oregon Health Sciences Center (which later became Oregon Health and Sciences University), a public employer participating in PERS, in a position that normally required more than 600 hours of service each year. In August of that same year, after six months of uninterrupted service, she became a

---

[1] In its final order, the board, like petitioner and the administrative law judge, relied on the 1989 version of *former* ORS 237.109. On appeal, petitioner posits that the 1975 version of *former* ORS 237.109 applies, presumably because petitioner first established membership in August 1975. *See* 236 Or App at 20. The 1975 version of the Oregon Revised Statutes, however, became effective on September 16, 1975, *after* petitioner first established membership. *See* Oregon Revised Statutes, i (1975). None of the 1975 amendments that became effective before September 16, 1975, affects our analysis in this case. Thus, our proper focus is on the 1973-74 version of the Oregon Revised Statutes, which were in place in August 1975.

Additionally complicating matters, by 1987, a number of those statutes had been amended or repealed. Further, in 1995, the statutes governing PERS were moved from ORS chapter 237 to ORS chapter 238 and comprehensively renumbered. For more information, see the information compiled before ORS chapter 237 (2009).

Importantly, there were no material changes in the essential components of the PERS statutes that are relevant to our analysis between 1975 and 1987, the time period applicable to this case. Consequently, all citations, unless otherwise noted, are to the 1973-74 version of the Oregon Revised Statutes.

PERS member. Petitioner resigned from that position on November 15, 1976.

On January 3, 1978, petitioner started working part-time as an instructor at Clackamas Community College (CCC), which also participated in PERS. Petitioner worked for CCC from January 1978 until March 1987, but did not work 600 hours during any of those years.[2] Both petitioner and CCC made contributions to the Public Employees Retirement Fund (the fund),[3] based on petitioner's work, each year between 1978 and 1987.

From 1988 until 1990, petitioner worked part-time as a pediatric nurse practitioner for Kaiser, which was not a PERS-participating employer. Then, in April 1991, petitioner began working for Benton County and worked more than 600 hours each year for that employer until she retired on April 3, 2006. Benton County participated in the PERS system and made contributions to petitioner's member account every year.

In February 2006, PERS informed petitioner that her projected monthly retirement benefit amount was between $1,006 and $1,214, depending on the calculation method and option she chose.[4] Subsequently, petitioner submitted to PERS a Service Retirement Application and a check to purchase her waiting period from 1975.[5]

After petitioner retired, PERS audited her account and work history and concluded that the contributions that

---

[2] Petitioner also worked one day for Clackamas County in 1977.

[3] The fund, which consisted of all member contributions, employer contributions, and the interest accrued on those contributions, was used to pay retirement and other benefits to members and to pay the administrative expenses of the system. *Former* ORS 237.271; *see also Strunk v. PERB*, 338 Or 145, 157, 108 P3d 1058 (2005).

[4] Petitioner had the choice of having her retirement allowance calculated under one of three service retirement allowance formulas: Full Formula, Pension Plus Annuity, or Money Match. *See generally Strunk*, 338 Or at 160-61 (describing formulas). As we understand it, petitioner could also choose between various options that, in general terms, allowed her to take a reduced service retirement allowance during her lifetime with the provision that it would continue after her death on behalf of a designated beneficiary. *See* ORS 238.305 (2005).

[5] Petitioner's waiting period was the "six months' service uninterrupted by a total of more than 30 working days" petitioner had to complete before becoming a PERS member in 1975. *See former* ORS 237.011.

CCC had made to petitioner's member account each year between 1978 and 1987 were in error. According to PERS, petitioner was not employed in a "PERS-qualifying position" at CCC because she did not work 600 hours during any of those years. Accordingly, PERS reversed petitioner's service time, contributions, and associated interest from that period.[6] Relatedly, PERS determined that petitioner had lost her PERS membership on December 1, 1981, and had not vested, because, after she became a member in 1975, she was not employed in a "PERS-qualifying position" for at least five consecutive years. Thus, PERS concluded that all of petitioner's service time and contributions before November 15, 1976, had gone into "Loss of Membership" status, and that petitioner was entitled to a refund of $425. Additionally, PERS determined that petitioner had to reestablish her membership upon obtaining PERS-qualifying employment at Benton County in 1991, which required serving a new six-month waiting period, and so reversed her contributions and earnings during that six-month period as well.[7] Based on those adjustments, PERS recalculated petitioner's estimated retirement benefit amount to be about $665 per month.

Petitioner sought and received a hearing before an administrative law judge (ALJ). The ALJ issued a proposed order sustaining PERS's determination that petitioner's employment with CCC was not PERS-qualifying employment and, accordingly, that she had lost her membership and did not vest between 1978 and 1987. The ALJ reasoned that, although *former* ORS 237.109 (1989) did not expressly require 600 hours of service per year to prevent loss of membership, that standard for qualifying employment inhered in the PERS statutory and regulatory scheme.

In reaching that determination, the ALJ considered, as relevant context to *former* ORS 237.109 (1989), PERS administrative rules that employed a 600-hour annual service standard, including Rules 1 and 19 of the Public Employees

---

[6] PERS refunded CCC a total of $1,233, reflecting the amount of the employer contributions, withholdings, and "pick-up" contributions, but not accumulated interest, during that period.

[7] PERS refunded Benton County $937, reflecting the amount of the employer contributions and "pick-up" contributions, but not accumulated interest, during that period.

Retirement Board (Administrative Order-PER 3; adopted August 12, 1949) (hereinafter "Rule 1" and "Rule 19").[8] Further, the ALJ adopted the reasoning of an Attorney General Opinion from 1952, which, *inter alia*, examined then-extant PERS rules and various PERS statutes that imposed a 600-hour annual service requirement in particular contexts and concluded that "[a] public employe whose periods of employment * * * do not in any fiscal year total 600 hours is, during such year, an inactive member * * * and contributions by him or in his behalf cannot be accepted by the retirement board." 26 Op Atty Gen 58 (1952) (boldface omitted). In its final order, the board "affirm[ed] and adopt[ed]" the ALJ's reasoning and conclusions of law.

On review, the parties' dispute continues to center around the correct interpretation of *former* ORS 237.109(2) and how it fits into the PERS statutory scheme. *Former* ORS 237.109 provided, in part, that

"[a]n employe shall cease to be a member of the system:

"* * * * *

"(2)   In the event that he is absent from the service of all employers participating in the system for a total of more than five consecutive years after he becomes a member of the system[.]"[9]

Petitioner contends that the terms of *former* ORS 237.109(2) are unambiguous: A PERS member would cease to be a member if he or she was "absent from the service" of all PERS employers for more than five consecutive years. Petitioner posits that "service," as commonly understood, means "work"—and that the statute included no reference to any 600-hour requirement. Thus, petitioner reasons, PERS

---

[8] Rules 1 and 19 were adopted in 1949, before the compilation of the Oregon Administrative Rules. They were readopted, in substantially the same form, after the enactment of the Public Employees Retirement Act of 1953. *See* Rules 1 and 19 of the Public Employees Retirement Board (Administrative Order-PER 7; adopted May 17, 1954). The text of those rules is set out below. *See* 236 Or App at 29.

[9] After the period pertinent in this case, the legislature amended the statute in such a way as to provide that the failure to work at least 600 hours each year for five consecutive years would result in the loss of membership. *See* Or Laws 2005, ch 152, §§ 4-5; *see generally* 236 Or App at 30-31, 31 n 21 (describing present statutes).

membership would cease under *former* ORS 237.109(2) only if the member failed to perform *any* work for any PERS employer within a given five-year period. Accordingly, in petitioner's view, because she worked for CCC each year from 1978 to 1987, her membership, which was established as of August 1975, never ceased. Finally, petitioner contends that the statutes and rules incorporating a 600-hour standard that the ALJ and board invoked apply only in their particular context and are inapposite to termination of membership.

The board counters that *former* ORS 237.109(2) must be considered in context of the overarching PERS statutory and administrative scheme—which, according to the board, has always contemplated that 600 hours of service is a minimum prerequisite for maintaining active membership. In particular, the board argues that Rule 19 is relevant because it is part of the "pre-existing PERS administrative rules upon which PERB relied," and so provides "context for interpretation of the PERS statutes."

Thus framed by the parties, the question presented—whether petitioner was "absent from the service" of all participating public employers under *former* ORS 237.109(2) when she worked in a position that normally required fewer than 600 hours per year—is one of statutory interpretation. In construing the operative language, we apply the rules of statutory construction set forth in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993), as amplified in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009).

■ ■    Our goal, in construing the text of *former* ORS 237.109(2), is to discern what the legislature intended at the time that it originally enacted the critical statutory language in 1953. *See* Or Laws 1953, ch 200, § 15(6).[10] In pursuing that

---

[10] Petitioner contends that, for purposes of our statutory analysis, we should consider what the legislature intended when it first enacted *former* ORS 237.109 as part of the Public Employees Retirement Act of 1945. Although the statutory language under dispute was originally adopted in 1945, that statute is not the one at issue in this case. *See* Or Laws 1945, ch 401, § 16(4). As the Oregon Supreme Court has previously observed, shortly after the legislature's general enactment of the Oregon Revised Statutes in 1953, *former* ORS 237.109, along with the rest of the 1945 Act, as amended, was repealed to permit state employees to receive certain federal Social Security benefits. *Hughes v. State of Oregon*, 314 Or 1, 7 n 7, 838 P2d 1018 (1992); *see also* Or Laws 1953, ch 180, §§ 1-2. Thereafter, the legislature

inquiry, we consider the text and context of the statute in light of any legislative history that appears useful to our analysis. *Gaines*, 346 Or at 172.

■        When the phrase "absent from the service" was enacted in 1953, the term "service" was not defined for purposes of the PERS statutes. However, in contemporaneous common usage, "service" meant "[p]erformance of labor for the benefit of another, or at another's command" and "[p]erformance of official duties for a sovereign or state; official function[.]" *Webster's New Int'l Dictionary* 2288 (2d ed unabridged 1950). Thus, as relevant here, in common usage, "service" meant performance of labor—or, more plainly, "work." "[A]bsent from the service" meant *not* working. Significantly, in common usage, the term "service" did not (and does not) import some quantitative feature, much less some minimum threshold requirement (*viz.*, "at least 600 hours").

That generic connotation of "service" in *former* ORS 237.109(2) is contextually corroborated in two significant respects. First, other PERS statutes enacted in 1953 consistently conflated the term "service" with the concept of employment. *See generally Tharp v. PSRB*, 338 Or 413, 422, 110 P3d 103 (2005) ("When the legislature uses the identical phrase in related statutory provisions that were enacted as the part of the same law, we interpret the phrase to have the same meaning in both sections."). For example, *former* ORS 237.003(2) (1953), which defined the term "continuous service" for purposes of the PERS statutes, provided, in pertinent part, that

_____

enacted the Public Employees Retirement Act of 1953, Or Laws 1953, ch 200, § 1, which included the statute presently under consideration, *former* ORS 237.109. *See* Or Laws 1953, ch 200, § 15(6).

Although not material to our analysis, in 1953, the pertinent language in *former* ORS 237.109(2) appeared in subsection (1) of that statute. In 1955, the substance of subsection (1) was switched with subsection (2) of that same statute. *See* Or Laws 1955, ch 131, § 7. Thus, from 1955 through 1987, the pertinent statutory language appeared in *former* ORS 237.109(2). At the same time, the legislature substantively amended the language of that subsection to clarify the length of absence from service required to terminate one's PERS membership. *See* Or Laws 1955, ch 131, § 7. As amended, *former* ORS 237.109(2) thereafter, in pertinent part, provided: "In the event that he is absent from the service of all employers participating in the system for a total of more than *five consecutive years* after he becomes a member of the system." (Emphasis added.)

"continuous service shall be computed without regard to interruptions in the case of:

"* * * * *

"(b)   An employe who had returned to the *service* of his employer as of January 1, 1945, and who remained in *that employment* until having established membership in the Public Employes' Retirement System."

(Emphasis added.) *See also former* ORS 237.003(7) (1953) (defining "salary" to mean "the remuneration paid an employe in cash out of the funds of a public employer in return for his *services* to the employer" (emphasis added)); *former* ORS 237.125 (1953) (discussing the "reemployment" of members who have voluntarily "separated from service"); ORS 237.133(5) (1953) (discussing "reemployment" of retired members who request to be "continued in service").

Second, as amplified below, the 1953 legislature also enacted several statutes referring to "service" but explicitly qualifying that term by reference to a particular quantum of service—*viz.*, 600 hours. *See, e.g., former* ORS 237.011(3) (1953) (providing that a public employer that employs five or more people, "each of whose position requires 600 hours of service per year," that is not participating in PERS may join the system); *former* ORS 237.133(3) (1953) (providing that, except as otherwise provided, a PERS member who has reached compulsory retirement age may not be reemployed in a position with a participating employer that "normally requires 600 hours of service" per year). Those statutes demonstrate that the 1953 legislature knew how to incorporate a 600-hour service requirement where it wanted to— something it did not do in *former* ORS 237.109(1) (1953).[11] *See PGE*, 317 Or at 614 ("The legislature knows how to include qualifying language in a statute when it wants to do so.").

In sum, with references to the most basic sort of context, the unadorned language of *former* ORS 237.109(2)

---

[11] Although the legislature amended or repealed various PERS statutes between 1953 and 1987, when petitioner stopped working for CCC, none of the intervening changes suggested that the legislature intended to fundamentally alter the meaning of "service."

appears to mean exactly what it says: "[A]bsent from the service" means absent from service, not "absent from at least 600 hours of service." The board proffers no legislative history contradicting that understanding, and we are unaware of any such history.

One final, broadly overarching aspect of context further supports petitioner's construction of *former* ORS 237.109(2). Specifically, as we will endeavor to explain, if the board's interpretation is correct, then petitioner would be deemed to have been "absent from the service of all employers participating in the system" in years in which she and her employer, CCC, were statutorily obligated to make PERS contributions.

As noted, petitioner became a member of PERS in August 1975, after she had completed six months of uninterrupted service in a position at University of Oregon Health Sciences Center that "normally require[d]" at least 600 hours of service per year. *Former* ORS 237.011.[12] Additionally, as a member, petitioner was entitled to an "account" in the fund. *Former* ORS 237.275 (providing that "[t]he board shall provide for an individual account for each member of the system").

At the time that petitioner began working for CCC in January 1978, she was still a member of PERS, even under the board's proposed construction of *former* ORS 237.109(2), because five years had not elapsed since her last year of at

---

[12] *Former* ORS 237.011 provided, in part:

"No person may *become a member* of the system unless he is in the service of a public employer and has completed six months' service uninterrupted by a total of more than 30 working days during the six months' period. Every employe of a participating employer shall become a member of the system at the beginning of his first full pay period following the six months' period. All public employers participating in the Public Employes' Retirement System * * * shall participate in, and their employes shall be members of, the system, except as follows:

"* * * * *

"(4) * * * no employe whose position with one public employer or concurrent positions with two or more public employers normally require[s] less than 600 hours of service per year may become a member of the system."

(Emphasis added.)

least 600 hours of service. Accordingly, she was required to make contributions to PERS pursuant to *former* ORS 237.071(1), which provided that "[e]ach employee who is a member of the system shall contribute to the fund * * *."[13] Consequently, so long as petitioner was a member—that is, until such time as her PERS membership ceased—she was statutorily obligated to contribute to the fund a prescribed percentage of her salary, *id.*, and that was so regardless of whether she was working at least 600 hours a year.[14] Further, pursuant to *former* ORS 237.081(1),[15] CCC was required to contribute to the fund on petitioner's behalf.

---

[13] That portion of *former* ORS 237.071(1) did not materially change until 1993, when *former* ORS 237.071(1) was amended to require contributions by "active" members. Or Laws 1993, ch 177, § 5. At the times pertinent to our consideration, between 1978 and 1987, the distinctions between "active" and "inactive" membership, which were later adopted by the legislature, were not part of the PERS statutes.

Although the language in the 1973-74 statute differed from that in the 1953 antecedent statute, the operation of the contribution requirement was functionally analogous. In 1953, the amount of a member's contribution to the fund was calculated using actuarial tables to achieve a certain, stated retirement benefit goal based on the member's "average salary earned while a member of the system." *Former* ORS 237.071(2), (4) (1953). That statute additionally provided that the employer "shall deduct" the amount of the "member['s]" contribution from his or her salary and transmit it to the board, which would "cause it to be credited to his account in the fund." *Former* ORS 237.071(4) (1953). Likewise, *former* ORS 237.081(1) (1953) required participating public employers to make contributions "necessary to match the benefits which will be provided its employes" to the fund on those employees' behalf.

[14] It is undisputed that, while working at CCC, petitioner was an "employe" for purposes of *former* ORS 237.071. *Former* ORS 237.003(4) provided, in part:

"The term 'employe' includes, in addition to employes, public officers, but does not include:

"* * * * *

"(b) *Seasonal, emergency or casual workers whose periods of employment with any public employer or public employers do not total 600 hours in any calendar year.*"

(Emphasis added.) The board does not contend, much less did it find, that petitioner, while at CCC, was a "seasonal, emergency or casual worker[ ]." Thus, although petitioner worked fewer than 600 hours a year at CCC, she did not fall within that precisely limited exception to "employe" status.

[15] *Former* ORS 237.081(1) provided, in pertinent part:

"A public employer which is a member of the system shall, at intervals designated by the board, transmit to it such amounts as are actuarially computed to be necessary * * * to adequately provide the benefits to be provided by the contributions of the employer under [the PERS statutes] * * *."

The foregoing highlights the practical implications, under then-extant statutes, of the parties' contending constructions of *former* ORS 237.109(2). Under petitioner's interpretation, any year in which a member performed work giving rise to a statutory obligation to make a contribution would not count as one of the five successive years of "absen[ce] from * * * service" required to terminate membership. Conversely, in the board's view, a member could, for five successive years, work—indeed, work up to 599 hours a year—for a public employer, requiring both to make substantial contributions to the fund in each of those years, and yet membership would be deemed to have ceased at the end of that period.

To be sure, either reading is abstractly plausible. However, it would be at least anomalous to require employees and employers to make PERS-related contributions based on work performed during certain periods, while at the same time treating those periods of employment as the basis for divesting the employee of his or her PERS membership. Nothing in the statutory text or design compels such a result and, without some indication or expression to the contrary, we decline to ascribe such an incongruous intention to the legislature.

The board's contentions to the contrary are unavailing. First, the board points to various PERS statutes that refer to "600 hours of service per year"[16] as evidencing an implicit, holistic legislative understanding that "service" connotes at least 600 hours of public employment. However, nothing in the board's analysis, much less in those statutes themselves, demonstrates that the coherent operation of the system somehow depends on such a premise. Indeed, as

---

[16] *See, e.g., former* ORS 237.011(3) (1953) (providing that a public employer that employs five or more people, "each of whose position requires 600 hours of service per year," that is not participating in PERS may join the system); *former* ORS 237.133(3) (1953) (providing that, except as otherwise provided, a PERS member who has reached compulsory retirement age may not be reemployed in a position with a participating employer that "normally requires 600 hours of service" per year). Those statutes demonstrate that the 1953 legislature knew how to incorporate a 600-hour service requirement where it wanted to—something it did not do in *former* ORS 237.109(1) (1953).

noted above, those statutes contradict the board's understanding of legislative intent with respect to the "absen[ce] from the service" language of *former* ORS 237.109(1) (1953)—again, when the 1953 legislature wished to impose a 600-hour threshold requirement, it knew how to do so.

The board's reliance on PERS Rules 1 and 19 is similarly unpersuasive. Even assuming, without deciding, that PERS Rules 1 and 19 properly bear on the application of the "absen[ce] from the service" language as enacted in 1953,[17] those rules do not support the board's position. In particular, Rule 1 read, in pertinent part, as follows:

> "During each year for which a year of prior service credit was allowed, an employe must have been employed in a position normally requiring *not less than 600 hours of service per year* and during the year must have worked not less than the major fraction of the year computed on a monthly, weekly or daily basis."

(Emphasis added.) Thus, that rule explicitly pertained to an employee's public service *before* that employee established PERS membership. It neither refers to, nor purports to define, the meaning of "service" for the purpose of the PERS statutory scheme generally or for *former* ORS 237.109 (1953) particularly.

Rule 19 read as follows:

> "An inactive member is one who has terminated his regular employment with a participating employer and who has not withdrawn his net accumulations in the retirement fund. No employe-employer contributions on account of such inactive member shall be accepted by the Board if he is re-employed in a temporary, casual or emergency position which does not normally require at least 600-hours per year of service."

That rule is inapposite to petitioner's circumstances because it applied only to "inactive member[s]" who were reemployed in a "temporary, casual or emergency position."[18] Petitioner

---

[17] *See Strunk*, 338 Or at 235-36 (recognizing that, if the legislature so intends, administrative rules may become part of the statutory contract).

[18] Indeed, the board's conduct in accepting contributions based on petitioner's work throughout the pertinent period belies its present construction and

was not a "temporary, casual or emergency" worker.[19] Consequently, Rule 19 did not apply to her.

For similar reasons, we find the reasoning in the 1952 Attorney General Opinion unpersuasive. In that opinion, the Attorney General endorsed the validity of Rule 19's requirement that contributions not be accepted on behalf of "inactive members," based on the conclusion that the PERS statutory scheme as a whole established a 600-hour requirement for maintaining "active" membership. In reaching that conclusion, however, the Attorney General did not construe any of the PERS statutes at issue consistently with the methodology set out in *PGE*, 317 Or at 610-12, and *Gaines*, 346 Or 160. Accordingly, the Attorney General failed to appreciate that there was no statutory basis for Rule 19's distinction between "active" and "inactive" membership in the PERS statutory scheme at that time.[20] Additionally, the Attorney General failed to account for the language in Rule 19 and Oregon Laws 1949, chapter 587, section 1(2) (defining "employe"), which excluded only "seasonal, emergency or casual workers" from PERS-qualifying employment.

Ultimately, the Attorney General's opinion was predicated on a policy-permeated premise that the absence of an underlying 600-hour annual service requirement for maintaining PERS membership would be "foreign to the plan and purpose of the retirement system." 26 Op Atty Gen 58 (1952). However, nothing in the text and structure of the PERS statutes and rules extant in 1952—or between 1978 and 1987—compels such a conclusion.

The legislature could—and did—create a pension system that expressly imposed a threshold standard for

---

invocation of Rule 19. If, as the board contends, petitioner was a person subject to that rule, the board would have been obligated not to accept those contributions.

[19] The terms "temporary, casual or emergency position" were not defined by the PERS rules or statutes. However, the board does not contend that petitioner's position at CCC could properly be so characterized. *Cf. Webster's New Int'l Dictionary* 2598 (2d ed unabridged 1950) (defining "temporary" as "[l]asting for a time only; existing or continuing for a limited time; not permanent; ephemeral; transitory[.]"); *id.* at 837 (defining "emergency" as "[r]are" or "[a]n unforeseen combination of circumstances which calls for immediate action" (emphasis omitted)); *id.* at 419 (defining "casual" as "[c]oming without regularity" and "occasional").

[20] As noted, the PERS statutes did not include any reference to, or distinction between, "active" and "inactive" members until 1993. *See* 236 Or App at 27 n 13.

becoming a member, but did not prescribe the same standard with respect to subsequent contributions and maintaining membership. To be sure, the legislature could have designed the system differently initially—and, indeed, the legislature has since amended the PERS statutes to include and define concepts of "[a]ctive" and "[i]nactive" membership, ORS 238.005(12)(b)-(c) (2009), and "[q]ualifying position," ORS 238.005(19) (2009)—and those amendments have, in turn, altered the operation of ORS 238.095 (2009), the present analog of *former* ORS 237.109, pertaining to termination of membership. Because of those amendments, the present termination provision of ORS 238.095(2) (2009) does, in fact, incorporate the limitation that the board urges us to read into the former statute.[21] But *former* ORS 237.109(2) did not.

In sum, petitioner was not "absent from the service" of a PERS-participating employer for the purposes of *former* ORS 237.109(2) during the period of her employment with CCC between 1978 and 1987. The board erred in concluding otherwise.

Reversed and remanded.

---

[21] ORS 238.095(2) (2009) reads, in part, as follows:

"[A]n inactive member ceases to be a member of the system if the member is not vested and is inactive for a period of five consecutive years."

An "[i]nactive member" is a "member who is not employed in a *qualifying position*, whose membership has not been terminated in the manner described by ORS 238.095, and who is not retired for service or disability." ORS 238.005(12)(c) (2009) (emphasis added). A "[q]ualifying position" is pertinently defined, in turn, as "one or more jobs with one or more participating public employers in which an employee performs 600 or more hours of service in a calendar year." ORS 238.005(19) (2009).